FILED
U.S. DISTRICT COURT
SAVANNAH DIV.
2019 DEC 17 PM 3:34
CLERK_____
SO. DIST. OF GA.

**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| KELPHIE K. LUNDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. CV418-149 |
| | ) | |
| CITY OF GUYTON, GEORGIA, a | ) | |
| Municipal Corporation; | ) | |
| JEFFREY LARISCY, | ) | |
| Individually and in his | ) | |
| capacity as Mayor; LAUREE | ) | |
| MORRIS, Individually and in | ) | |
| her capacity as City Clerk | ) | |
| and interim City Manager; | ) | |
| STEPHEN COLLINS, | ) | |
| Individually and in his | ) | |
| capacity as City Council | ) | |
| Member; | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## O R D E R

Before the Court is Defendants the City of Guyton,
Georgia (the "City"), Jeffrey Lariscy, individually and in
his official capacity as Mayor, Lauree Morris, individually
and in her capacity as City Clerk and Interim City Manager,
and Stephen Collins', individually and in his capacity as
City Council Member, Motion for Summary Judgment. (Doc. 24.)
For the following reasons, Defendants' Motion for Summary
Judgment (Doc. 24) is **GRANTED.**

**BACKGROUND**

I.  PLAINTIFF'S WORK HISTORY

In his complaint, Plaintiff Kelphie K. Lundy claims that he was discriminated against and terminated due to his race. (See Doc. 1.) Plaintiff, an African American male, left the Statesboro Police Department and began working for the City as Director of Public Safety ("DPS") in March 2015. (Doc. 24, Attach. 1 at ¶ 9; Doc. 27 at 4.) As part of the hiring process, Plaintiff was interviewed by a board that included Robert Black, the then City Manager, Sheriff Jim McDuffie, and the then Fire Chief Phillip School. (Doc. 24, Attach. 1 at ¶ 10; Doc. 27 at 4.) As DPS, Plaintiff's duties included overseeing both the City's Police Department and the Fire Department, their finances, officers, and work hours. (Doc. 24, Attach. 1 at ¶ 13; Doc. 27 at 4.) Plaintiff attended some meetings with the Fire Department, but not all. (Id.) During Plaintiff's tenure as DPS, the then Fire Chief David Starling, a Caucasian male, was terminated and Plaintiff felt that he was not permitted to conduct the hiring process to fill the vacancy. (Doc. 24, Attach. 1 at ¶ 17-18; Doc. 27 at 5.)

However, Plaintiff was not explicitly instructed not to hire a Fire Chief.[1] (Doc. 25 at 78.)

On March 4, 2016, Plaintiff received a written reprimand from former City Manager, Robert Black. (Doc. 27, Attach. 4 at 1.) Plaintiff was reprimanded for "lack of professional tone in text messages and emails to other city employees (Oct 2015)," "violation of City of Guyton Personnel Policy in recruiting and hiring of employees," "failure to document (either verbal or in writing) inappropriate actions involving subordinates" surrounding excessive speed of personnel in a patrol car, and the "resignation of Larry Kirkland." (Id.) The written reprimand stated that the supervisor would "continue to monitor performance related to the issues above" and "provide training and/or redirection if needed." (Id.) Plaintiff was not provided any training or further evaluation on the issues listed in the March 2016 reprimand. (Doc. 27, Attach. 19 at 131.)

Defendant Morris served as the Interim City Manager and then the City Manager from September 2016 until July 2018. (Doc. 24, Attach. 4 at ¶ 2.) On October 3, 2016, Plaintiff issued a written reprimand to Stacy Strickland, a Caucasian

---

[1] Despite Plaintiff's contention in his response brief, Plaintiff testifies in his deposition that he was not instructed not to hire a fire chief.

3

male, regarding mishandling of evidence. (Doc. 27, Attach. 19 at 63-64.) The following day, Strickland sent a complaint to Defendant Morris complaining of a hostile work environment under Plaintiff. (Id. at 64.) Additional complaints of hostile work environment against Plaintiff were submitted by Strickland and Officer Marston on October 11, 2016. (Id.) Defendant Morris originally believed that the claims of hostile work environment could have been motivated in retaliation for legitimate disciplinary action, however, after viewing how others were treated for like circumstances and like violations, she felt that the hostile work environment complaints were not made in retaliation. (Id. at 65.) During the investigation of the hostile work environment complaints, Defendant Morris spoke with Strickland, Marson, Officer Hartwell, and a former employee, Faith Hogan. (Id. at 60.) Defendant Morris did not interview or speak with Plaintiff about the complaints. (Id. at 61.)

On October 25, 2016, Defendant Morris issued a Letter of Documentation/Written Reprimand to Plaintiff. (Doc. 25 at 141-43.) The written reprimand stated that (1) Plaintiff's conduct continued to be inappropriate by violations of the Police Chief Position Classification Plan and/or the City's personnel policy; (2) Plaintiff failed to perform duties according to the Guyton Police Department Standard Operating

4

Procedures regarding respect to fellow employees, non-disclosure, and being away without official leave; and (3) Plaintiff violated the Guyton Personnel Policy by violating the equal employment opportunity policy (illegal harassment and retaliation) and failure to follow the hiring process. (Id.) Additionally, the reprimand found that Chief of Police duties were being violated to wit: (1) failure to inform of substantial public safety activities in timely manner; (2) failure to ensure subordinates abide by city policies with tobacco use; (3) failure to maintain adequate Police/Fire Department workforce by failing to ensure adequate personnel coverage when the fire chief was placed on administrative leave and failing to ensure adequate "street" coverage when police staff were placed on light duty; (4) failure to support department and its members by not being supportive of subordinates and their responsibilities; (5) failure to fulfill duties requested by City Manager, Mayor/Council and failure to respond to inquiries; (6) discussed non-public city matters with citizens; (7) failure to manage subordinates properly by discussing employees with other employees; (8) failure to display an attitude of cooperation by being disrespectful to subordinates when they are off and/or not available, revising the work schedule, and issuing orders in an unprofessional or not civil tone; (9) harassment

of subordinates; (10) failure to manage or grow Police/Fire Department; (11) failure to respond to mandatory call-outs in that subordinates and dispatch could not reach Plaintiff; and (12) failure in Plaintiff's fiduciary capacity by not managing the budget, failing to adhere to the budget, and altering employee time/work scheduled to avoid crediting employees with overtime or call-back hours. (Id. at 142-43.)

Although Plaintiff testified in his deposition that subordinates could always reach him by his cell phone, Defendant Morris testified that Plaintiff's employees told her that they had trouble reaching him and Defendant Morris herself had difficulty reaching him and that, when he did respond to text messages, his responses would be rude and unprofessional. (Doc. 24, Attach. 4 at ¶¶ 3-5.) One neglect of duty issue occurred in relation to Plaintiff's conduct during Hurricane Matthew. Plaintiff stated that he and his officers met together and that, while he could not recall what they decided to do, the general plan was to stay in Savannah. (Doc. 25 at 46-47.) Plaintiff admits that he was in Metter, Georgia when Hurricane Matthew hit but that he was not on duty at the time and was in Metter to buy lanterns to have at the Police Department. (Id. at 47.) Additionally, Plaintiff did not attend the hurricane "prep day," a mandatory meeting for all essential personnel. (Doc. 24, Attach. 4 at

¶ 8-9.) In regards to the budget issue, Plaintiff was authorized to use the City-issued credit card to purchase uniform shirts in the amount of $40 but chose to also have the shirts tailored which cost an additional amount. (Id. at ¶ 16.) The additional amount, around $30, was not an approved expense. (Id.)

Plaintiff disagreed with the written reprimand and sent a letter of appeal to Defendant Morris and the Mayor and Council on November 4, 2016. (Doc. 27, Attach. 10 at 1.) Plaintiff denied all alleged wrongdoing outlined in the written reprimand and requested an official investigation be conducted by outside law enforcement. (Id.) In response, Defendant Morris informed Plaintiff that the appeal had been received and requested Plaintiff "clearly state the specific relief you are seeking." (Id. at 2.) Plaintiff claims that the City failed to provide him with an unbiased, external investigation as it did for other employees. (Doc. 27 at 9.) Specifically, Plaintiff claims that the City provided other similarly situated Caucasian employees with the external investigation including former PDS Randy Alexander, who Plaintiff contends was accused of policy violations similar to Plaintiff, and former Fire Chief Gary Jarriel, who was alleged to have violated policy. (Id. at 9-10.)

Plaintiff was issued a letter of reprimand on February 14, 2017 in which Defendant Lariscy, as Mayor, outlined numerous issues that Plaintiff had committed. (Doc. 25 at 144-145.) The letter stated that Plaintiff failed to provide support to the Fire Department in that Plaintiff did not communicate with the former Fire Chief or the interim Fire Chief and Plaintiff failed to respond to a letter of reinstatement for a former firefighter from the Interim Fire Chief and Assistant Fire Chief. (Id.) Defendant Lariscy identified an issue with Plaintiff's performance as DPS in that, to his knowledge, Plaintiff did not complete his fire certification training, would seldom attend fire department meetings, generally failed to support the fire department, and failed to respond to a request to reinstate a firefighter. (Doc. 27, Attach. 19 at 11-15.) The letter again mentioned the issues with employees, dispatch, and City employees being unable to reach Plaintiff and Plaintiff failing to return phone calls and the hostile work environment claims. (Doc. 25 at 144-45.)

Additionally, the letter identified two other areas where Plaintiff failed in his duties. First, the letter stated that Plaintiff requested and received additional funds to pay for a new patrol car and Plaintiff was directed to order the car in August but that, at the time of the reprimand in mid-

8

February, the car was still not in service. (Id. at 145.)
Second, Plaintiff had allowed the computer program that was
"vital for the performance of police department operations"
to expire without putting measures into place to ensure the
continuation of operations. (Id.) Defendant Lariscy became
aware that the computer software program that the Police
Department used for recordkeeping was not working and, after
discussing the issue with the software's salesperson, learned
that the software was current but not installed with the
proper license and that the cost would be $800, not the
estimated $9,000 for an upgrade. (Doc. 27, Attach. 19 at 18-
20.) Defendant Lariscy believed that Plaintiff should have
caught the issue as he was the head of the department and
managed the budget. (Id. at 20; Doc. 24, Attach. 3 at ¶ 29.)
Another incident involved the scheduling of Stacy Strickland,
who was at the time a captain in the Police Department.
Plaintiff would leave Strickland, who was on light duty work
restrictions, as the only officer on duty which would result
in Strickland responding to calls in violation of his work
restrictions. (Doc. 24, Attach. 4 at ¶ 18-19; Doc. 24, Attach.
3 at ¶¶ 31-34; Doc. 27, Attach. 19 at 15-16.)

At the conclusion of the letter, Plaintiff was notified
that the City intended to terminate his employment or he may
resign in lieu of termination. (Doc. 25 at 145.) Plaintiff

9

did not resign and was notified by letter from Defendant Lariscy dated February 16, 2017 that Defendant Lariscy was recommending to the Council that Plaintiff's employment be terminated. (Id. at 146.) A termination appeal hearing was conducted on March 9, 2017. (Doc. 24, Attach. 3 at ¶ 40.) A termination decision can be overturned if three councilmembers voted to overturn it, however, at the time of Plaintiff's appeal, there were only three filled councilmember seats and, therefore, all three would need to vote to overturn the decision. (Id. at ¶¶ 41-42; Doc. 1 at ¶¶ 63-64.) Plaintiff's termination was ultimately upheld by the Council as Defendant Collins voted to uphold the termination decision. (Doc. 24, Attach. 5 at ¶ 8.)

## II. COMPARATOR FACTS

In Plaintiff's response brief, Plaintiff provides three comparators to demonstrate that he was treated differently than other similarly situated individuals: Stacy Strickland, Gary Jarriel, and Randy Alexander. (Doc. 27 at 13.) After Plaintiff was terminated, Strickland served as interim DPS. (Doc. 24, Attach. 3 at ¶ 43.) Around June 2018, Councilmember Lee found an anonymous note on his doorstep concerning a complaint that a member of the Guyton Police Department had created a fake Facebook account, containing photoshopped images of a Guyon firefighter, and was using the page to

sexually harass a woman. (Id. at ¶ 46.) Lee brought the complaint to Defendant Lariscy's attention and the attention of the City Council. (Id. at ¶ 47.) The woman's husband reported the page to the Guyton Police Department's page and was informed that Strickland would be investigating the issue. (Id. at ¶ 48.) However, it was suspected that Strickland was actually involved in the incident and that no investigation had occurred. (Id.) The City contacted the Effingham County Sheriff's Office to conduct an investigation and Strickland and the officer involved were suspended pending the outcome of the investigation. (Doc. 24, Attach. 3 at ¶ 50.) The investigation found that Strickland failed to properly investigate the report of sexual harassment, intentionally failed to investigate due to his own involvement in the creation of the fake Facebook account, instructed a subordinate to create the Facebook account, and had been complicit in possessing, sharing, or creating the photoshopped images of subordinates in demeaning pornographic memes displaying City equipment and/or symbols. (Id. at ¶ 51.) As a result, Strickland's employment was terminated and the other officer resigned in lieu of termination. (Id. at ¶ 54.)

The City, through Defendant Lariscy, also requested an independent, external investigation of Gary Jarriel, the then

Fire Chief, due to a citizen complaint that he had been involved in an inappropriate relationship through his position as fire chief. (Doc. 27, Attach. 12 at 1.) The City of Rincon Police Department conducted the investigation and found that Jarriel had "violated Guyton Policies as he acted in an indecent and immoral way as it pertains to his actions with Mrs. Davis. . . . Chief Jarriel used City resources such as his city truck to seek out and engaged Mrs. Davis. . . ." (Id. at 27.) This conduct and investigation resulted in a letter of reprimand dated July 28, 2016 from Defendant Lariscy to Jarriel finding that Jarriel violated numerous policies and procedures of the Fire Department and/or the City. (Id. at 6-7.) Subsequently, on or around January 2017, Plaintiff completed an employee discipline form against Jarriel and recommended suspension, demotion, and/or termination of Jarriel due to numerous violations of City policies and Fire Department policies related to the reporting of an injury of a firefighter at a scene. (Id. at 10-14.) Jarriel resigned in lieu of termination. (Doc. 27, Attach. 19 at 12.)

Former PSD Randy Alexander received a written reprimand dated February 26, 2014 from Robert Black, the then City Manager, and Michael Garvin, the then City Mayor, for failing to properly stamp time cards and other payroll issues and speaking in a discourteous tone to the public and other

employees. (Doc. 27, Attach. 11 at 3-5.) Subsequently, sometime in or around August 2014, the Mayor and City Manager, at the direction of the City Council, requested an external investigation of Alexander "to determine if there was sufficient evidence to relieve Alexander as Chief of Police." (Id. at 1.) Alexander was investigated by Dan Mealor at the Effingham County Sheriff's Office. (Id.) In the report, Mealor referenced numerous statements included in "a packet containing documented problems" and determined that the issues were either (1) unable to be substantiated because there was not enough evidence to determine if there was a policy violation, (2) the statements/allegations were not a policy violation on Alexander's part, or (3) the allegations/statements were issues with outside parties. (Id. at 1-2.) The "packet containing the documented problems" was not attached to the report or supplied to this Court.

On June 18, 2018, Plaintiff filed his complaint in this Court. (Doc. 1.) In his complaint, Plaintiff brings a claim against Defendant City for racial discrimination pursuant to Title VII (Id. at 14-16) and a claim against Defendants Morris, Lariscy, and Collins for unlawful discrimination based on his race pursuant to the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution (Id. at 16-18). Defendants Lariscy, Morris, and Collins are

sued individually and in their capacities as employees of the City. (Id. at 1.) Plaintiff also brings a claim for intentional infliction of emotional distress against all Defendants. (Id. at 18-19.)

## STANDARD OF REVIEW

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (citing Fed. R. Civ. P. 56 advisory committee notes). Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

14

As the Supreme Court explained:

> [A] party seeking summary judgment always
> bears the initial responsibility of
> informing the district court of the basis
> for its motion, and identifying those
> portions of the pleadings, depositions,
> answers to interrogatories, and
> admissions on file, together with the
> affidavits, if any, which it believes
> demonstrate the absence of a genuine
> issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then

shifts to the nonmovant to establish, by going beyond the

pleadings, that there is a genuine issue as to facts material

to the nonmovant's case. Clark v. Coats & Clark, Inc., 929

F.2d 604, 608 (11th Cir. 1991). The Court must review the

evidence and all reasonable factual inferences arising from

it in the light most favorable to the nonmovant. Matsushita,

475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving

party "must do more than simply show that there is some

metaphysical doubt as to the material facts." Id., 475 U.S.

at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence,

or simply conclusory allegations, will not suffice. See,

e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th

Cir. 1998). Nevertheless, where a reasonable fact finder may

"draw more than one inference from the facts, and that

inference creates a genuine issue of material fact, then the

Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

## ANALYSIS

I.  PLAINTIFF'S RACE DISCRIMINATION CLAIMS PURSUANT TO TITLE VII AND THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

Plaintiff has brought race discrimination claims under both Title VII and the Equal Protection Clause of the Fourteenth Amendment, by and through 42 U.S.C. § 1983. As there is no analytical difference between the two, Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009), the Court will treat them as one claim for the purpose of ruling on Defendants' motion. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A plaintiff may establish a claim of unlawful racial discrimination by presenting direct, circumstantial, or statistical evidence of discrimination. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). To assess a disparate treatment claim based only on circumstantial evidence, such as Plaintiff's claim in this case, the Court must employ the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Burke-Fowler v.

16

Orange Cty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Under this test, a plaintiff must establish a prima facie case of racial discrimination by proving four elements: (1) that he belongs to a protected class, (2) that he was subjected to an adverse employment action, (3) that he was qualified to perform the job in question, and (4) that his employer treated "similarly situated" employees outside his class more favorably. Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220-21 (11th Cir. 2019). If a plaintiff can demonstrate the elements of a prima facie case, then a burden of production falls to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. Id. at 1221. If the employer articulates a legitimate, non-discriminatory reason, the burden then shifts back to the plaintiff to demonstrate that the employer's stated reason was a pretext for discrimination. Id.

In their motion, Defendants argue that Plaintiff fails to present a valid disparate treatment claim because Plaintiff fails to identify a valid comparator who was treated more favorably than he was. (Doc. 24, Attach. 2 at 14.) The United States Court of Appeals for the Eleventh Circuit has recently clarified this circuit's standard for comparator evidence in discrimination cases. See Lewis, 918 F.3d 1213 (11th Cir. 2019). In Lewis, the Eleventh Circuit held that

17

the comparator analysis must be conducted at the prima facie stage of the McDonnell Douglas burden-shifting framework and that "a plaintiff asserting an intentional-discrimination claim under McDonnell Douglas must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.' " Id. at 1218. Generally, a similarly situated comparator will have "engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and "will share the plaintiff's disciplinary history." Id. at 1227-28.

In his response to Defendants' motion, Plaintiff identifies three comparators, Gary Jarriel, Randy Alexander, and Stacy Strickland, who "were treated more favorably, while not identical, these comparators are similarly situated in all material respects." (Doc. 27 at 13.) In regards to Jarriel, Plaintiff contends that Jarriel was suspected of policy violations including having an illicit affair with a woman on city property and received an external investigation into his alleged wrongdoing. (Id.) Plaintiff contends Alexander, a Caucasian male, was accused of several policy violations similar to those of Plaintiff and he also received

18

an external investigation into those alleged violations. (Id.) Finally, Plaintiff identifies Strickland as a comparator but then states that "Strickland was the interim DPS, but his conduct was far different from Plaintiff's, and his conduct was potentially criminal, so an outside agency was brought in to investigate." (Id.)

Defendants argue that none of these individuals are valid comparators. First, with respect to Jarriel, Defendants contend that Jarriel's misconduct was brought to light by a citizen complaint and he was suspected of having an affair with a woman so his conduct could have affected an official investigation. (Doc. 24, Attach. 2 at 17.) The Court agrees that Jarriel is not a sufficient comparator. As Plaintiff admits, he was suspected of having an illicit affair on city property. (Doc. 27 at 13.) The investigation, conducted by the City of Rincon Police Department, found that Jarriel had violated Guyton Policies as he acted in an indecent and immoral way as it pertains to his actions with Mrs. Davis and used his position as Fire Chief to further his conduct. (Doc. 27, Attach. 12 at 27.) The investigation resulted in a letter of reprimand dated July 28, 2016 from Defendant Lariscy to Jarriel finding that Jarriel violated numerous policies and procedures of the Fire Department and/or the City. (Id. at 6-7.) Subsequently, on or around January 2017, Plaintiff

completed an employee discipline form against Jarriel and recommended suspension, demotion, and/or termination of Jarriel due to numerous violations of City policies and Fire Department policies related to a separate incident. (Id. at 10-14.) Jarriel resigned in lieu of termination. (Doc. 27, Attach. 19 at 12.) Thus, to the extent that Plaintiff is contending that Jarriel was treated more favorably because his misconduct was investigated externally, this investigation occurred in relation to the allegations that Jarriel was involved in an affair with a woman and used his position as Fire Chief in that regard. Plaintiff's misconduct did not implicate the possibility of a biased investigation and was not brought to the attention of the City via a citizen complaint. Additionally, to the extent that Plaintiff is claiming that Jarriel was treated more favorably after receiving the written reprimand issued by Plaintiff, Plaintiff has not shown that to be true. Plaintiff recommended suspension, demotion, and/or termination of Jarriel and Jarriel resigned in lieu of termination. Plaintiff was also offered the option to resign in lieu of termination. (Doc. 25 at 144-146.)

Next, Defendants argue that Strickland, as the interim DPS, committed far different misconduct than Plaintiff's alleged misconduct, and Strickland's conduct was potentially

20

criminal, which necessitated the need for an external investigation. (Doc. 24, Attach. 2 at 17.) Plaintiff includes the same exact sentence in his response brief and, therefore, seems to agree that Strickland's conduct was so dissimilar as to remove him as a comparator. The Court agrees. Strickland was accused of participating in the creation of a fake Facebook account that was used to harass a woman. Due to this concern, the City contacted the Effingham County Sheriff's Office to conduct an investigation and Strickland and the officer involved were suspended pending the outcome of the investigation. (Doc. 24, Attach. 3 at ¶ 50.) The investigation found that Strickland failed to properly investigate the report of sexual harassment, intentionally failed to investigate due to his own involvement in the creation of the fake Facebook account, instructed a subordinate to create the Facebook account, and had been complicit in possessing, sharing, or creating the photoshopped images of subordinates in demeaning pornographic memes displaying City equipment and/or symbols. (Id. at ¶ 51.) Plaintiff's wrongdoing consisted of failing to provide support to the Fire Department, failing to respond to a request for reinstatement of a firefighter, failing to complete firefighter certification training, failing to respond to employees and City employees, creating a hostile work environment, failing

21

to place a recently obtained patrol car in service despite the fact that it was ready and available, and failing to rectify a situation in which the Police Department's reporting software was inoperable and failing to realize that it could be solved through installing the licensed version, among other misconduct claims. (Doc. 25 at 144-145.) None of these policy violations rises to the level of sexually harassing a citizen through a false Facebook profile and photoshopping a City firefighter onto inappropriate figures and memes. Additionally, Plaintiff has not sufficiently alleged or shown that Strickland was treated more favorably. As a result of the investigation, Strickland's employment was terminated, and the other officer resigned in lieu of termination. (Doc. 24, Attach. 3 at ¶ 54.)

Finally, Defendants contend that Alexander is not a valid comparator because Plaintiff fails to include specific information as to what misconduct Alexander is alleged to have committed, fails to include evidence on the outcome of Alexander's employment, e.g. if he resigned voluntarily, resigned in lieu of termination, or was terminated, and because the supervisors who requested the investigation of Alexander were not the same supervisors involved in reprimanding and terminating Plaintiff. (Doc. 29 at 9.) The Court agrees.

As discussed, a similarly situated comparator will have "engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and "will share the plaintiff's disciplinary history." Lewis, at 918 F.3d at 1227-28. The only evidence Plaintiff provides to support Alexander as a valid comparator is (1) the report from Dan Mealor of the Effingham County Sheriff's Office, which found either that Alexander did not commit a policy violation under the allegations or that there was not enough evidence to verify whether a policy violation had or had not occurred; and (2) Alexander's employee reprimand dated February 26, 2014 issued by the then City Manager, Robert Black, and the then Mayor, Michael Garvin. (Doc. 27, Attach. 11.) Plaintiff, in his response to Defendants' motion, states that "[t]he investigation report returned to the City failed to substantiate the numerous allegations against Mr. Alexander. Despite numerous policy violations having been substantiated, he was not terminated, nor was he asked to resign at that time." (Doc. 27 at 13.) Setting aside these patently inconsistent statements, the evidence provided by Plaintiff shows that the investigation report did not

substantiate any policy violations and Plaintiff does not cite to anything in the record to show that the violations were otherwise substantiated. At bottom, Plaintiff has not shown that Plaintiff and Alexander committed similar acts of misconduct or violated similar policies and were disciplined inconsistently. Accordingly, the Court finds that summary judgment is due to be granted to Defendants on Plaintiff's claims of race discrimination alleged pursuant to Title VII and the Equal Protection Clause of the Fourteenth Amendment.[2]

## II. PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

In support of their motion for summary judgment, Defendants argue that the state law claim for intentional infliction of emotional distress against the City is barred by sovereign immunity and the claim against the individual Defendants is barred by the doctrine of official immunity.

---

[2] While Defendants also argue that Defendants Lariscy, Morris, and Collins are entitled to qualified immunity on the Equal Protection Claims (Doc. 24, Attach. 2 at 18-21), the Court does not need to reach this analysis because Plaintiff has failed to make a prima facie case of racial discrimination under either Title VII or the Equal Protection Clause of the Fourteenth Amendment. See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008) (finding that the same prima facie case applies to a claim of race discrimination under § 1983 because the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same); Nurse v. City of Alpharetta, 775 F. App'x 603, 606 (11th Cir. 2019).

(Doc. 24, Attach. 2 at 22-25.) Defendants also argue that Plaintiff cannot show that they acted with a wicked or evil motive in terminating him, cannot show that the conduct complained of meets the standard of egregiousness, and cannot show that he suffered emotional distress. (Id. at 24.) Plaintiff does not rebut these arguments in his response. Rather, Plaintiff only claims that summary judgment should be denied "because the City has waived its immunity at least as to the amount of their insurance policy." (Doc. 27 at 18.)

The Court finds that Plaintiff has failed to state a claim for intentional infliction of emotional distress. In Georgia, the tort of intentional infliction of emotional distress is comprised of the following elements: "(1) [t]he conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; and (4) [t]he emotional distress must be severe." Jarrard v. United Parcel Serv., Inc., 242 Ga. App. 58, 59, 529 S.E.2d 144, 146 (Ga. Ct. App. 2000) (internal quotation marks and citation omitted). Under Georgia law, "extreme or outrageous conduct [is] conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Fortson v. Carlson,

618 F. App'x 601, 609 (11th Cir. 2015) (quoting Yarbrough v. SAS Sys., Inc., 204 Ga. App. 428, 429, 419 S.E.2d 507, 509 (Ga. Ct. App. 1992)). Despite Plaintiff not supporting his claim in his response, Plaintiff's complaint guides the Court somewhat in determining what conduct Plaintiff contends is extreme and outrageous. In his complaint, Plaintiff contends Defendants ignored evidence, failed to properly investigate the allegations of wrongdoing, disciplined him, ultimately terminated him, and communicated to third parties that he had committed wrongdoings. (Doc. 1 at ¶¶ 93-94.) Plaintiff goes on to allege that these actions are "evidence of a pattern of racial discrimination that constitutes extreme and outrageous conduct," and that he suffered "severe emotional distress." (Id. at ¶¶ 96-97.)

Generally, in Georgia, discharge or termination does not constitute the egregious kind of conduct on which a claim for intentional infliction of emotional distress can be based. Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992); Roddy v. City of Villa Rica, Ga., 536 F. App'x 995, 1003 (11th Cir. 2013) ("Georgia courts have held that an employer's termination of an employee—however stressful to the employee—generally is not extreme and outrageous conduct." (internal quotation marks and citation omitted)). The evidence in the case shows that Defendants issued written

reprimands to Plaintiff, ultimately terminated his employment, and then upheld the termination. Although Plaintiff's complaint alleges that Defendants' failure to investigate, issuance of reprimands, and termination were acts showing a pattern or practice of discrimination, Plaintiff has not cited to other acts of discrimination and has not shown, as discussed above, that the employment actions taken against him treated him differently than other similarly situated individuals. Moreover, Plaintiff has not elaborated on, or cited to any evidence supporting, his claim in the complaint that Defendants told third parties of his wrongdoing. Plaintiff has merely alleged that he was subject to the standard employment actions that occur in any workplace—discipline via written reprimands and termination. To the extent that Plaintiff alleges that Defendants failed to investigate the wrongdoing and ignored evidence, Plaintiff does not cite to evidence in the record to support this claim.

In sum, the Court does not find Plaintiff's written reprimands and ultimate termination to be extreme and outrageous conduct. See Southland Propane, Inc. v. McWhorter, 312 Ga. App. 812, 819, 720 S.E.2d 270, 276 (Ga. Ct. App. 2011) (finding the defendant's actions of accusing the plaintiff of misappropriating corporate funds and forgery, terminating plaintiff's employment, and ordering the plaintiff to leave

immediately were not extreme and outrageous); Lockhart v. Marine Mfg. Corp., 281 Ga. App. 145, 147, 635 S.E.2d 405, 407 (Ga. Ct. App. 2006) (finding numerous racist comments made to plaintiff in the workplace by different people to not be extreme and outrageous conduct); Ghodrati v. Stearnes, 314 Ga. App. 321, 323, 723 S.E.2d 721, 723 (Ga. Ct. App. 2012) (finding that the conduct by plaintiff's former coworkers who "repeatedly called [the plaintiff] racist and derogatory names, posted inappropriate signs about [the plaintiff] on the employee restroom door as well as in the middle of the shop" to be not sufficiently outrageous or extreme to support a claim for intentional infliction of emotional distress).

Additionally, Plaintiff has presented no evidence that he suffered severe emotional distress. In fact, Plaintiff has not cited to evidence at all describing or outlining the emotional distress that he allegedly suffered. This is insufficient. "Although, 'the frustration associated with losing one's job' " or being demoted " 'is understandable,' that frustration alone is not 'severe.' " Roddy, 536 F. App'x at 1003 (quoting Jones v. Fayette Family Dental Care, Inc., 312 Ga. App. 230, 234, 718 S.E.2d 88, 91 (Ga. Ct. App. 2011)). Accordingly, Plaintiff's claim for intentional infliction of emotional distress fails.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 24) is **GRANTED.** The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this 17ᵗʰ day of December 2019.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA